242

## WOOLSON SPICE CO. v. UNITED STATES.

### Civ. Nos. 5972, 5973.

United States District Court
N. D. Ohio, W. D.

June 22, 1949.

Donald F. Melhorn, Marshall, Melhorn, Wall & Bloch, Toledo, Ohio, for plaintiff.

Lyle M. Turner, Sp. Asst. to Atty. Gen., Don C. Miller, U. S. Atty., Cleveland, Ohio, Gerald P. Openlander, Asst. U. S. Atty., Toledo, Ohio, for defendant.

KLOEB, District Judge.

These two suits are civil actions against the United States of America for the recovery of $4,080.21 and $5,511.79, with interest, alleged to have been erroneously assessed and collected from the plaintiff for the years 1943, 1944 and 1945 as income and victory tax required to be withheld, and Federal insurance contributions and Federal unemployment tax relating to the social security taxes.

The two actions were consolidated for the purpose of trial by agreement of the parties. The underlying question of law, viz., whether certain persons who unloaded merchandise, chiefl · coffee, from freight cars spotted outside the plaintiff company's plant and moved this merchandise into the plant, were or were not employees of the company, is common to both of the cases. If these persons were not employees of the plaintiff company, then it follows that the taxes for the three years in question were erroneously assessed and collected, and plaintiff would be entitled to recover the respective amounts claimed in the complaints, with interest. The facts are in some instances in sharp disagreement.

The plaintiff company for some years had been, and still is, in the business of purchasing, processing, packaging and distributing coffee, tea and spices. These commodities were delivered to it in railroad cars that were spotted outside its plant. Merchandise, and we are concerned here chiefly with coffee, arrives in large bags of varying weight of from 132 to 180 pounds.

Prior to 1943, the work of unloading the merchandise from the railroad cars was performed by employees of plaintiff company. These men were under the direct supervision of the company's weighmaster, Fred Base. Mr. Base had been directing this work for many years. During the years 1943, 1944 and 1945, plaintiff discovered that it was unable to employ men necessary for the unloading process. Its business was declared by the War Man Power Commission to be a non-essential activity, and it had no labor priority rating. It therefore found it extremely difficult to employ laborers who could unload the freight cars and with hand trucks move the bags of coffee into the plant to the post of the weighmaster for stenciling and weighing, and then for stacking in convenient warehouse space. In addition, plaintiff was apprehensive lest it violate some war man power regulation, and so it contacted, through its plant superintendent, Mr. Louis G. Gongwer, one Harry A. Teal,

who was hired by plaintiff to recruit a necessary number of the floater type of laborers found about the pool rooms and taverns each morning and bring them to plaintiff's plant. When Harry Teal was called into the service, he was succeeded by one of the men who had been fairly consistent in working as a member of his crew, one Joe Rockamore, who worked in this capacity for some six or eight weeks. When Joe Rockamore left he was succeeded by one Hugh Pierce, who also had been one of the crew members. When Harry Teal returned from the service in the Fall of 1946, Mr. Pierce gave way to him and he, Teal, resumed his operations until December of 1945, at which point the company concluded that it could recruit its own men without the assistance of Teal.

The exact duties and the extent of control exercised by Teal, Rockamore and Pierce daily over these laborers is in dispute. It is undisputed that some six, eight or ten men were recruited each morning from the highways and byways by Teal, Rockamore and Pierce in the successive order named, and that these laborers were brought to the plant by Teal in his truck, and by Rockamore and Pierce on buses or streetcars. At the close of each day, the company paid to Teal or one of his successor a sum of money equal to 90¢ per hour for each of the laborers, including Teal and his successors, and out of this money so paid Teal or his successors, paid the men.

It is the claim of the Government that the taxpayer merely employed an additional man to hire from day to day a group of laborers wherever they could be found to do the work.

It is the claim of the taxpayer that it employed Teal, Rockamore and Pierce as independent contractors, and that the men who labored under them were the employees of Teal, Rockamore and Pierce, and not the employees of the company.

It is the contention of the Government that the finding and engaging of the laborers each morning, and paying them off each evening, were the only duties required of Teal or his successors, and that all direction and supervision was exercised, as it

had been for many years prior to 1943, by Fred Base, the weighmaster and employee of plaintiff company. On the other hand, it is the contention of the taxpayer that Teal and his successors were in complete charge of these laborers each day during the three years in question that they worked. This contention is made by the company witnesses, Louis G. Gongwer, plant superintendent, Edward Hase, the assistant plant superintendent, and Fred Base, the weighmaster.

Mr. Gongwer puts the issue very succinctly in the following words: "I gave no orders or directions to Teal's men nor did any other employee of Woolson's."

The question for the Court to determine is whether the three men who were employed by plaintiff to recruit the laborers to work at its plant, and the men so recruited, were employees of plaintiff for tax purposes under the common law rules applicable in determining the employer-employee relationship. I am of the opinion, from a study of the record, that plaintiff has failed to sustain the burden of proof cast upon it, and that these men were employees of plaintiff for tax purposes.

These cases have presented a sharp divergence of testimony, and hence the Court has been presented with a difficult decision, but it appears that, taking all the evidence by its four corners and weighing it carefully, this is not one of those cases where the three men hired could properly be classed as independent contractors who, in turn, were liable to the Government for the payment of withholding taxes and social security taxes on account of the men recruited by them for service at the plant of plaintiff.

During the trial of the case, the Court took extensive notes in connection with the testimony of each of the numerous witnesses. These witnesses included not only Teal and Pierce but also four of the laborers who had worked at various times as members of these crews.

Marcus Walton, a colored laborer, said the following: "Harry (Teal) left after he took us to the receiving clerk at the scales and then returned late in the afternoon to pay us off. Stacking Dad (Rock-

amore) succeeded Teal and during this time Fred (Base), not Dad, gave us the orders. Fred told me to work on the stack. Slim (Harry Teal) never gave me orders on the work to be done around the plant. After Dad left Hugh Pierce took on. He worked each day the same as we did. He would get the soft jobs—cutting lawn, etc. Any merchandise stored on the second floor was placed under orders of Fred (Base), not Teal, Dad or Pierce. Harry Teal never did any work or supervising."

Witness Charles Durr had this to say: "Fred (Base) gave us our orders as to which car to unload, when to go out to eat and when to be back. He would change us from one job to another. He told me how to stack and he told me where to pile sacks. Teal never gave us orders. After he picks us up he returns to pay us off. Several times Fred (Base) paid us off. I took all orders there from Fred. When Fred paid us off each got a separate envelope. Took orders from Fred all the time."

Witness Glen Hooker, testified as follows: "I worked under Harry Teal and no one else. Fred (Base) gave us our orders. Teal never gave orders."

On cross examination he said the following: "Teal did no work. Never watched in. Teal paid me."

Witness Tom Keesee said the following: "I worked in 1943 for Hugh Pierce. He would go out with us on a bus and work all day with us. I trucked out of the railway cars to the scales and also stacked. Fred (Base) gave us our orders. Pierce gave none."

Harry Teal testified as follows: "I was to bring them and leave them and return to get them in the evening. There was no talk of social security or withholding taxes. I was to get 90¢ per hour for each man working including myself. The weighmaster (Fred Base) had charge of the men during my absence. I never knew who I had and so could not put any one in charge when I left. I had no office but had a telephone in my home. I never held myself out to the public as a supplier of stevedores. I had no tools or equipment. The equipment belonged to the company. I had a motor vehicle used to gather up the men. I was told by the superintendent each evening how many men to bring the next day. When I went into the army in October of 1943 I did not know who took over. When I came back Pierce told me he was glad to get rid of it and I took over. On the days when I failed to return at 4 P. M. the paymaster paid them off and held my pay until the next day. The men quit one day and I was called to the plant and they said that Fred was driving them too hard. He agreed to let up on them and they went back to work. The hours that the men worked were never filled in before I signed the pay voucher."

On cross examination Teal said the following: "I did not supervise the men or tell them what to do. After I gathered them up in the morning I brought them to the plant. I would sit around, read the paper, or walk around the plant. On occasions I told the men to go into a car to unload and to truck in. I never taught stacking because I do not know how it is done. Nothing was said about the social security and withholding tax."

Hugh Pierce testified as follows: "I worked there under Teal and Stacking Dad and then took men out to work. Fred (Base) told me to take them out. He told me to bring the best men that I could. Fred told me each afternoon how many men to bring out the next day. I didn't give the men orders myself. Fred told which men to go in the cars, which to truck, stack, etc. I did anything that they asked me to do. I handled pepper on the third floor, coffee, labels, water in the basement, anything about the plant that needed to be done. I cut the lawn many times. I never told any one to boss—I wasn't a boss myself. Fred gave the orders at times and Teal did at times. Fred showed me and the other men how to stack and where to stack. I was just a laborer out there. Fred gave the orders when Stacking Dad was there."

On cross examination he said the following: "The superintendent and assistant superintendent gave orders to Fred and Fred to the men. The assistant superintendent

(Hase) fired the man who had liquor. I did not. I never told him how much time was put in for the information on the pay slip."

It appears to the Court that the duties of Teal and his successors as employees of the plaintiff company, were to hire employees for the plaintiff and bring them to the plant; that from that time on plaintiff took command and gave it directions through its weighmaster just as it had done to April of 1943, and just as it did subsequently to December of 1945. The control and the right to control the work of all of these men, not only as to the result to be accomplished, but also as to the details and means by which that result was accomplished, appeared to be in the plaintiff through its own employees.

The complaints are ordered dismissed at plaintiff's costs.

The defendant may, within fifteen (15) days, prepare and file its Findings of Fact and Conclusions of Law, drawn in accordance with this opinion. The plaintiff may, within fifteen (15) days thereafter prepare and file its exceptions or suggested additions thereto.